# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| NAIM RASOOL MUHAMMAD, | § | |
| TDCJ No. 999582, | § | |
| PETITIONER, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-39-X-BK |
| | § | (DEATH PENALTY CASE) |
| BOBBY LUMPKIN, DIRECTOR, | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, CORRECTIONAL | § | |
| INSTITUTIONS DIVISION, | § | |
| RESPONDENT. | § | |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

Before the Court is Petitioner Naim Rasool Muhammad's *Opposed Motion for Stay and Abeyance*, Doc. 30.  Respondent has filed a response in opposition to the relief sought, Doc. 52. For the reasons outlined here, the motion for stay and abeyance should be **GRANTED**.

## I.  BACKGROUND

The Texas Court of Criminal Appeals opinion affirming Muhammad's capital murder conviction and death sentence on direct appeal sets forth the relevant facts of Muhammad's offense of conviction:

> Appellant and Kametra [Sampson] met and began dating in 2003, when Kametra was fifteen years old and appellant was twenty-five. Within a few weeks, appellant began physically abusing Kametra. The first episode of abuse occurred during an argument in the back yard of appellant's father's house. Kametra told appellant that she was leaving and turned to walk away. Appellant grabbed her, threw her into his car, punched her repeatedly, and told her that she was not leaving. He did not let her go home that day.

Appellant beat Kametra once or twice a week for the first four or five years of their relationship, and then the beatings became more frequent. Appellant usually abused Kametra by punching her in the face with his fists. In 2006, Kametra told appellant that she was pregnant. Appellant told her to get an abortion, and when she refused, he attempted to induce a miscarriage by punching and kicking her stomach. When that failed, appellant urged Kametra to drink bleach or use a wire hanger, but Kametra did not do so. Kametra later gave birth to the couple's first child, Naim. In 2008, Kametra informed appellant that she was pregnant with their second child. She again refused to get an abortion and appellant again attempted to induce a miscarriage by punching and kicking her stomach. The attempt failed, and Kametra gave birth to Elijah. Appellant did not punch and kick Kametra in the stomach when she informed him that she was pregnant with their third child, Jeremiah, but appellant continued to physically abuse her by punching her in the face.

Around Christmas of 2010, Kametra left appellant, taking their three sons with her. Appellant continued to physically abuse Kametra when he had the opportunity. He also used their sons in his efforts to control her. For example, on February 24, 2011, appellant showed up at Kametra's mother's house, and Kametra went outside to talk to him. He told Kametra that he wanted to take Naim and Elijah, but Kametra told him that he could not. She went back inside and tried to close the door, but appellant forced his way into the house. He pushed Kametra against the wall and punched her in the face. He then rushed into the dining room and grabbed Naim. While carrying Naim, he kicked down a side door and fled. Police found Naim a short time later and returned him to Kametra.

As a result of this incident, appellant was arrested for assaulting Kametra. Appellant was already on probation for a 2009 assault on his sister, and the State subsequently filed a motion to revoke his probation based on this new offense. However, the motion to revoke remained pending because appellant stopped reporting to his probation officer and avoided contact with other law-enforcement officials.

Kametra and appellant continued to communicate after the February 2011 incident, and the boys sometimes visited appellant. Appellant repeatedly asked Kametra to reconcile with him, but she rejected his requests. On March 24, 2011, all three boys visited appellant at his brother's house. Appellant told Kametra that he could not take Naim to preschool that day, so Kametra borrowed a car from her sister, Gabrielle, and drove to the house to pick up the boys. Kametra stopped the car in front of the house, loaded the children into the back seat, and sat down in the driver's seat. Appellant, who was standing by the car, asked Kametra to take him to the store. She told him that she could not do that because she had to return the car to Gabrielle.

Appellant climbed into the car anyway. Kametra again told appellant that she could not take him to the store and asked him to get out of the car. Appellant became upset and choked Kametra into unconsciousness.

2

When Kametra regained consciousness, she and the boys were inside the house. Appellant hit Kametra in the head with a heavy object when she told him that she needed to leave. Kametra finally persuaded appellant to let her go, telling him that Gabrielle would call the police if she did not return the car soon. Appellant allowed Kametra to leave with the boys, but he insisted on riding with them.

Gabrielle was waiting outside when they stopped the car. As Kametra exited the car, Gabrielle saw her battered condition and called the police. Appellant picked up Elijah and told Kametra, who was holding Jeremiah, that he would kill Elijah if she did not walk away with him. Appellant walked away quickly, carrying Elijah. Kametra, still carrying Jeremiah, followed appellant slowly because she did not want to go with him. Appellant attempted to hide when police officers arrived, but when he realized that the officers had seen him, he dropped Elijah and ran away.

By the time of the instant offense, a Child Protective Services ("CPS") worker had instructed Kametra not to let appellant visit the boys unless his mother accompanied him. Kametra complied with this instruction. Nevertheless, at around 6:30 a.m. on Naim's first day of kindergarten, appellant borrowed a friend's car and showed up at Kametra's house, unannounced and alone. He stated that he wanted to take Naim to school. Kametra and her mother told appellant to leave several times before he complied.

A short time later, while Kametra and Elijah were walking Naim to school, appellant pulled up in a car in front of them, jumped out, and picked up a rock. He threatened to hit Kametra in the head with it if she and the boys did not get into the car with him. After they were in the car, appellant drove toward Naim's school, but he passed it without stopping and announced that Naim would not go to school that day. Appellant drove erratically while he threatened and hit Kametra. His demeanor alternated between hostile and affectionate. He told Kametra several times that he would kill her and the boys.

When appellant stopped the car at a traffic light, Kametra saw a constable's car in the next lane. She jumped out of appellant's car and ran to the constable for help. Although the light was still red and another car was stopped in front of him, appellant drove the car over the curb and sped away with the boys. He told them that their mother did not care about them anymore. He stopped the car near a creek and walked the boys down the embankment. The boys told appellant that they loved him, and Naim asked him not to kill them.

Having second thoughts, appellant walked the boys back up to the car and smoked a cigarette while he considered his next move. He concluded that he could not take the boys back to the house because the police would be waiting for them. After deciding to complete his plan, appellant walked the boys back down the embankment. Appellant carried Elijah after Elijah complained that he could not walk down by himself. Elijah cried for his mother, and appellant told the boys that

she ran away and he did not know where she was. Naim repeated, "I love you, dad," over and over.

Appellant told the boys to sit down in the water, turn away from him, and pretend they were swimming. They complied, and he held their heads under water. Naim was kicking, but appellant would not let him get up. Appellant did not let up until both boys stopped moving. Appellant left their bodies in the creek and drove to Kametra's house, where he broke a window in the room where Jeremiah was sleeping. Appellant attempted to climb through the window, but Kametra's brother entered the room and pushed appellant back outside. Appellant, as he was leaving, stated, "Your nephews are dead now."

After he committed the offense, appellant evaded capture and resisted arrest. Appellant told his mother, who was waiting for him at his brother's house, that he would not go home because he knew the police were looking for him and he did not want to go back to jail. While law-enforcement officers searched for him, appellant abandoned the car and fled on foot. He kicked and fought with the arresting officers when they found him. Five or six officers struggled to restrain him, and they "Tazed" him three times before they were finally able to handcuff him. Appellant did not stop fighting until he was handcuffed.

After the offense but before his capture, appellant's mother asked appellant what he had done to her grandsons. Appellant told her that he "didn't do that" and that Kametra "did it" by refusing to let him see them. After he was captured, appellant said in his statement to police that he regretted what he had done and that the only reason he killed the boys was to prove a point to Kametra. He stated that he would not have done it if she had stayed with him in the car. Following his statement, appellant asked the investigating officer to tell Kametra that it was her fault that he killed the boys because he would not have done it if she had let him see them. He also asked the investigator to tell his sisters that he was sorry he "did this stupid-ass shit."

While in jail, appellant wrote a letter to Kametra's mother in which he stated that he would never do anything to hurt the boys. He declared that he still loved Kametra. He also stated that the boys' deaths were Kametra's fault because she got out of the car, and Kametra's mother's fault because she did not let appellant into her house.

*Muhammad v. State*, AP-77,021, 2015 WL 6749922, *1–*3 (Tex. Crim. App. Nov. 4, 2015).

There is no genuine dispute as to the foregoing facts. Petitioner turned himself into law enforcement authorities and gave a confession. Most of the foregoing factual recitation was drawn from Muhammad's statement to police.

On May 15, 2013, a Dallas County jury convicted Muhammad of one count of capital murder. Doc. 56-4 at 18. The jury later answered the future dangerousness special issue affirmatively and the mitigation special issue negatively. Muhammad directly appealed his conviction and sentence to the Texas Court of Criminal Appeals ("TCCA"). His appellant's brief was filed by attorney John Tatum, and among the 54 points of error raised were arguments attacking (1) the sufficiency of the evidence supporting the jury's finding on the future dangerousness special issue (point 42) ; (2) the constitutionality of the Texas capital sentencing special issues (points 43–54); and (3) the state trial court's (a) rulings on challenges for cause during jury selection (points 1–20); (b) evidentiary rulings (points 23-35 & 37-39); (c) denial of Muhammad's motion for mistrial (point 36); (d) alleged comment on the weight of the evidence (point 40); and (e) ruling on Muhammad's objection to the prosecution's closing jury argument (point 41). Doc. 56-4. The Texas Court of Criminal Appeals ("TCCA") affirmed Muhammad's conviction and sentence. *Muhammad*, AP-77,021, 2015 WL 6749922.

Subsequently, on June 23, 2015, Muhammad's state habeas counsel, Texas Office of Capital and Forensic Writs, filed Muhammad's initial state habeas application. Volume 1 SHCR 37-173, Doc. 59-1. Muhammad argued in pertinent part that he was exempt from execution because he was intellectually disabled, and his state trial counsel rendered ineffective assistance by failing to adequately investigate Muhammad's background and present all available mitigating evidence.[1]

---

[1] The former of these two claims is commonly known as an *Atkins* claim based upon the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), which declared intellectually disabled individuals to be constitutionally immune from execution due to their inherently reduced moral culpability for their capital offenses. The latter type of claim is commonly known as a *Wiggins* claim based on the Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), a case in which the Supreme Court found trial counsel ineffective for failing to adequately investigate his client's background and to present readily available

The state habeas trial court issued an order on November 21, 2019, adopting the State's proposed findings of fact and conclusions of law. 2 SHCR 1132-33, Doc. 59-2, at 708-09. The State's proposed findings and conclusions appear at 2 SHCR 1086-1131, Doc. 59-2, at 562-606 of 611. Later, the TCCA adopted the trial court's findings and conclusions, independently concluded Muhammad's ineffective assistance claim did not satisfy the dual prongs of *Strickland v. Washington*, 466 U.S. 668 (1984), and denied state habeas relief. *Ex parte Muhammad*, WR-85,343-01, 2020 WL 6777968, *1–*2 (Tex. Crim. App. Nov. 18, 2020).

## II. FEDERAL PROCEDURAL HISTORY

Muhammad filed his first amended federal habeas petition on August 12, 2022, Doc. 29, asserting 27 claims for relief. As relevant here, Muhammad's first claim for federal habeas relief asserts that he is exempt from execution under *Atkins* because he is intellectually disabled.[2] Doc. 29, at 1-25. In support, Muhammad proffers two statements from mental health professionals, Dr. Bhushan Agharkar and Dr. Natalie Novick Brown, both of whom opine that Muhammad qualifies as mildly intellectually disabled. Notably, Muhammad presented a similar *Atkins* claim as his second ground for relief in his state habeas corpus application, but the TCCA concluded

---

mitigating evidence (some of which was contained in state court records on file in the same courthouse in which Wiggins' capital murder trial took place).

[2] While the parties' pleadings in both the state habeas court and this court occasionally employ the terms "mental retardation" and "mentally retarded," following lead of the Supreme Court and Fifth Circuit, this opinion uses the terms "intellectual disability" and "intellectually disabled" to describe the same conditions. *See Hall v. Florida*, 572 U.S. 701, 704-05 (2014) ("This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts, the manual is often referred to by its initials 'DSM,' followed by its edition numbers, *e.g.*, 'DSM-5.'"); *In re Cathey*, 857 F.3d 221, 223 n.1 (5th Cir. 2017) ("The term 'intellectual disability' has replaced 'mental retardation.'" (citing *Brumfield v. Cain*, 576 U.S. 305, 308 n.1 (2015)).

that Muhammad had abandoned that claim and dismissed the claim. *Ex parte Muhammad*, WR-85,343, 2020 WL 6777968, *2.

In his third claim, Muhammad argues, *inter alia*, that his state trial counsel rendered ineffective assistance by failing to adequately investigate Muhammad's background and present available mitigating evidence regarding Muhammad's traumatic life history, epilepsy and neurological impairments, Fetal Alcohol Syndrome Disorder ("FASD") and brain damage, and Muhammad's remorse for his offense. Muhammad presented a similar ineffective assistance claim as his first claim in his state habeas application. However, the TCCA expressly found Muhammad's ineffective assistance claim failed to satisfy the dual prongs of *Strickland* and denied relief on the merits. *Ex parte Muhammad*, WR-85,343, 2020 WL 6777968 at *1.

By the instant motion, Muhammad requests a stay to allow him to return to state court and exhaust available state habeas remedies with regard to his *Atkins* and *Wiggins* claims. For the reasons set forth *infra*, Muhammad is entitled to a stay and abeyance on his *arguably* unexhausted *Atkins* claim but not on his already fully litigated *Wiggins* claim.

### III. ANALYSIS

A stay and abeyance to permit exhaustion of state court remedies on unexhausted claims for relief is appropriate in the context of a pending federal habeas corpus proceeding only when a district court determines that (1) there is good cause for a petitioner's failure to exhaust his claims in state court; (2) the unexhausted claims are not plainly meritless; and (3) the petitioner has not engaged in abusive litigation tactics or intentional delay. *Rhines v. Weber*, 544 U.S. 269, 277–78 (2005); *Haynes v. Quarterman*, 526 F.3d 189, 196 (5th Cir. 2008).

Here, Muhammad argues that a stay should be granted as to his *Atkins* claim because, *inter alia*, he has good cause for not exhausting it; namely, that it relies on new legal and factual

bases, given that the criterion for establishing intellectual disability have changed since he filed his state habeas petition.  Doc. 30 at 9-14.  He further argues that good cause exists if his "ID diagnosis was not foreclosed by the prior clinical standards, and the diagnosis was available, postconviction counsel was ineffective for failing to develop and present his *Atkins* claim competently."  Doc. 30 at 15-17.  He argues that the state court erred in deeming his *Atkins* claim abandoned because (1) counsel averred the claim would only be "suspended," rather than waiving or abandoning it, (2) "because the Eighth Amendment categorically bans the execution of the intellectually disabled, an *Atkins* claim cannot be waived," and (3) there is nothing in the record to support a finding that Muhammad's federal right under *Atkins* was knowingly and intelligently waived.  Doc. 30 at 17-18.  As to his *Wiggins* claim, Muhammad appears to contend that if the Court find his *Atkins* claim unexhausted, his related ineffective assistance claim is likewise unexhausted.  Doc. 30 at 18.

Respondent counters, *inter alia*, that (1) Muhammad fails to show that "changing standards for intellectual disability . . .  had any bearing on his inability to raise the claims in state court," (2) at the evidentiary hearing on the state habeas application, Muhammad's counsel explicitly stated that the *Atkins* claim was waived, (3) state habeas counsel was not ineffective in relying on the opinions of mental health experts in abandoning the *Atkins* claim, and (4) the narrow exception excusing default as to ineffective assistance of counsel claims under *Martinez v. Ryan*, 556 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), only applies to claims of ineffective assistance of trial counsel, and not that of habeas counsel.  Doc. 52 at 10-18.

8

A.  *Atkins* Claim

Prior to the United State Supreme Court's holding that intellectually disabled capital

murderers are exempt from execution under the Eighth Amendment, federal courts had taken a

pragmatic approach to resolving issues involving questions of intellectual disability.  *See*, *e.g.*,

*Brown v. Sec'y, Health & Human Services*, 948 F.2d 268, 270 (6th Cir. 1991) ("Mild **Mental**

**Retardation** is roughly equivalent to what used to be referred to as the educational category of

"educable."  This group constitutes the largest segment of those with the disorder—about 85%.

People with this level of **Mental Retardation** typically develop social and communication skills

during the preschool years (ages 0–5), have minimal impairment in sensorimotor areas, and often

are not distinguishable from normal children until a later age.  By their late teens *they can*

*acquire academic skills up to approximately sixth-grade level; during their adult years, they*

*usually achieve social and vocational skills adequate for minimum self-support,* but may need

guidance and assistance when under unusual social or economic stress.  At the present

time, *virtually all people with Mild Mental Retardation can live successfully in the community,*

*independently* or in supervised apartments or group homes (unless there is an associated disorder

that makes this impossible)." (quoting DSM–III–R § 317.00)).

In *Atkins*, the Supreme Court concluded the execution of intellectually disabled persons

failed to fulfill either of the two justifications for capital punishment: retribution and deterrence;

and held the Eighth Amendment forbids the execution of intellectually disabled persons.  *Atkins*,

536 U. S. at 318-21.  The Supreme Court cited two clinical definitions of "mental retardation"

with approval[3] but, ultimately, left to the States "the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."[4]  *Id.*, 536 U. S. at 317.

Nonetheless, the Supreme Court recognizes that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."  *Brumfield v. Cain,* 576 U.S. 305, 315 (2015) (quoting *Atkins v. Virginia*, 536 U. S. at 309 n.5).  Thus, an IQ score of 75 is "squarely in the range of potential intellectual disability."  *Brumfield v. Cain*, 576 U.S. at 315-16.

---

[3] In a footnote in *Atkins*, the Supreme Court identified two clinical definitions of "mentally retarded" as follows:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work.  Mental retardation manifests before age 18."  Mental Retardation, definition, Classification, and Systems of Supports 5 (9th ed. 1992).

> The American Psychiatric Association's definition is similar.  "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."  Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).  "Mild mental retardation" is typically used to describe people with an IQ of 50-55 to approximately 70.  *Id.*, at 42-43.

*Atkins*, 536 U.S. at 309 n.3.

[4] In *Bobby v. Bies*, 556 U. S. 825 (2009), the Supreme Court pointed out that *Atkins* did not provide definitive procedural or substantive guides for determining when a person who claims intellectual disability will be so impaired as to fall within *Atkins'* compass.  *Bobby*, 556 U.S. at 831.

Relying on the Supreme Court's holding in *Atkins*, the Texas Court of Criminal Appeals adopted a set of practical factors designed to assist in determining whether a criminal defendant convicted of capital murder qualified as intellectually disabled. *Ex parte Briseno*, 135 S.W.3d 1, 8 (Tex. Crim. App. 2004). The Court of Appeals for the Fifth Circuit expressly approved the TCCA's use of these so-called *Briseno* factors. *See*, *e.g.*, *Chester v. Thaler*, 666 F.3d 340, 346-48 (5th Cir. 2011) (holding the TCCA's use of the *Briseno* factors was not an unreasonable application of *Atkins*).

With regard to the first prong of the *Atkins* analysis, *i.e.*, establishing significantly subaverage intellectual functioning, the Supreme Court subsequently held that, because of the imprecision inherent in IQ testing,[5] a court must consider the standard error of measurement ("SEM") when assessing intellectual disability:

---

[5] In *Hall v. Florida*, 572 U.S. 701 (2014), the Supreme Court explained in some detail the nature of the imprecision inherent in IQ testing:

> The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. See D. Wechsler, The measurement of Adult Intelligence 133 (3d ed. 1944) (reporting the range of error on an early IQ test). Each IQ test has a "standard error of measurement," *ibid.*, often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. See R. Furr & V. Bacharach, Psychometrics 118 (2d ed. 2014) (identifying the SEM as "one of the most important concepts in measurement theory"). An individual's IQ test score on any given exam may fluctuate for a variety of reasons. These include the test taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing. See American Association on Intellectual and Developmental Disabilities, R. Schalock et al., User's Guide To Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports 22 (2012) (hereinafter AAIDD Manual), A. Kaufman, IQ testing 101, pp. 138-39 (2009).

> The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For the purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either

The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.

By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous professional consensus." APA Brief 15. Neither Florida nor its *amici* point to a single medical professional who supports this cutoff. The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37. This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins, supra,* at 309, n.5, 122 S. Ct. 2242, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

*See Id.,* 572 U.S. 701, 721-22.

---

side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies. See APA Brief 23 ("SEM is a unit of measurement: 1 SEM equates to a confidence of 68% that the measured score falls within a given score range, while 2 SEM provides a 95% confidence that the measured score is within a broader range"). A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. See DSM-5, at 37 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points) . . . . This involves a score of 65-75 (70 +/- 5); APA Brief 23 ("For example, the average SEM for the WAIS-IV is 2.16 IQ test points and the average SEM for the Standford-Binet 5 is 2.30 IQ test points (test manuals report SEMs by different age groupings; these scores are similar, but not identical, often due to sampling error"). Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. See Schneider, Principles of Assessment of Aptitude and Achievement, in The Oxford Handbook of Child Psychological Assessment 286, 289-291, 318 (D. Sakolfske, C. Reynolds, V. Schwean, eds. 2013). In addition, because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.

*Hall,* 572 U.S. at 712-14.

12

In *Moore v. Texas*, 581 U.S. 1, 11-20 (2017) (*Moore I*), the Supreme Court further restricted states' ability to circumscribe the legal definition of "intellectual disability," holding (1) a state's determination under *Atkins* must be guided by current medical standards[6] and (2) states are not free to adopt criteria unsupported by medical science to evaluate a defendant's alleged subaverage intellectual functioning or deficits in adaptive skills.[7]   More specifically, the

---

[6] In *Moore I*, the Supreme Court emphasized its holding in *Hall* implicitly required that states employ current medical diagnostic standards in making findings of significantly subaverage intellectual functioning and significant deficits in adaptive skills:

> In *Hall v. Florida*, we held that a State cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70.  Although *Atkins* and *Hall* left to the States "the task of developing appropriate ways to enforce" the restriction on executing the intellectually disabled, States' discretion, we cautioned, is not "unfettered."  Even if "the views of medical experts" do not "dictate" a court's intellectual-disability determination, we clarified, the determination must be "informed by the medical community's diagnostic framework."  We relied on the most recent (and still current) versions of the leading diagnostic manuals - the DSM-5 and AAIDD-11.   Florida, we concluded, had violated the Eighth Amendment by "disregarding established medical practice."  We further noted that Florida had parted ways with practice and trends in other States.  *Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide.  But neither does our precedent license disregard of current medical standards.

*Moore I*, 581 U.S. at 11-14 (citations omitted). "The medical community's current standards supply one constraint on States' leeway in the area.  Reflecting improved understanding over time, see DSM-5, at 7, AAIDD-11, at xiv-xv, current manuals offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.*, 581 U.S. at 20.

[7] For instance, the Supreme Court pointed out the Texas appellate court focused on Moore's perceived adaptive strengths in certain areas when the current clinical approach called for identification of deficits in adaptive skills.  *Moore I*, 581 U.S. at 15.  The Texas appellate court also pointed out Moore's improved behavior in prison; whereas the Supreme Court noted clinicians caution against reliance on adaptive strengths developed in a controlled setting.  *Id.*, at 16.  The Texas appellate court attempted to explain away Moore's poor academic performance by pointing to traumatic childhood abuse and suffering; the Supreme Court pointed out the medical community employed such traumatic experiences as "risk factors" sufficient to explore the prospect of intellectual disability.  *Id.*, 581 U.S. at 16-17.  The Texas appellate court required Moore to show that his adaptive deficits were unrelated to his "personality disorder"; the Supreme Court pointed

Supreme Court held the TCCA erred in applying the non-clinical criteria known as the *Briseno* factors in evaluating a defendant's claim of intellectual disability because (1) some of the *Briseno* factors had implicitly been rejected by the medical community (in part because they were based on outdated stereotypes) and (2) all the *Briseno* factors were little more than lay perceptions of intellectual disability untethered to any clinical medical standard. *Moore I*, 581 U.S. at 15-20.

Two years after its decision in *Moore I*, in *Moore v. Texas*, 139 S. Ct. 666 (2019) (*Moore II*), the Supreme Court again struck down as a violation of the Eighth Amendment a new TCCA determination that Moore was not intellectually disabled, finding the TCCA had committed many of the same analytical errors identified in *Moore I*. *See Moore II*, 139 S. Ct at 668-72.

Thus, in both *Hall* and its two decisions in *Moore*, the Supreme Court has effectively held that, despite language to the contrary in its opinion in *Atkins*, the States are not free to adopt definitions of intellectual disability which vary from those employed by clinicians, to-wit, members of the medical community. *Moore I*, 581 U.S. at 20. The practical difficulty with this holding is that few, if any, state or federal judges have been trained as mental health clinicians. The same holds equally true for jurors.

Furthermore, directing state and federal judges to employ a purely clinical definition of intellectual disability amounts to a command that state and federal judges practice medicine

---

out mental health professionals have long recognized that intellectual disability may be co-morbid with a wide variety of personality disorders, attention-deficit disorder, depression, and even bi-polar disorder. *Id.*, at 17. The Supreme Court also rejected the Texas appellate court's reliance upon lay perceptions of Moore's intellectual functioning identified as the *Briseno* factors, identifying such standards as "lay stereotypes." *Id.*, at 15-19. Prior to its opinion in *Moore I*, the Supreme Court recognized the diagnostic criteria for intellectual disability are not exclusive, *i.e.*, individuals with intellectual disability also tend to have a number of other mental health disorders, including personality disorders. *Brumfield v. Cain*, 576 U.S. at 318-20.

without a license by making a highly complex and purely clinical diagnosis, i.e., distinguishing between borderline intellectual functioning (which is not a constitutionally protected status) and intellectual disability.  The Supreme Court is yet to address the ethical dilemma in which its *Atkins* jurisprudence has placed state and federal judges.

Likewise, the Supreme Court has made no effort to address the extensive testimony from mental health professionals in judicial decisions explaining there is no clear delineation between the capabilities of those individuals in the mildly intellectually disabled range and those individuals in the range of borderline intellectual functioning.  *See*, *e.g.*, *United States v. Williams*, 2023 WL 3902135, *12 (S.D. Fla. April 26, 2023) (quoting Dr. Kristen Conlon as testifying it is difficult to distinguish borderline intellectual functioning from mild intellectual developmental disorder); *Gibson v. Berryhill*, 2019 WL 7021665, *18 (D.S.C. Dec. 28, 2019) (recognizing that the difference between intellectual disability and borderline intellectual functioning is more dependent upon adapted functioning than numerical test scores); *Sasser v. Kelley*, 321 F.Supp.3d 921, 930 (W.D. Ark. 2018) (differentiating mild intellectual disability from borderline intellectual functioning requires careful consideration of available information because the two diagnoses appear similar; the difference is that borderline intellectual functioning does not contain the qualitative component of adaptive functioning deficits); *Williams v. Berryhill*, 2018 WL 1006057, *9 (W.D. La. Jan. 17, 2018) (explaining that intellectual disability and borderline intellectual functioning do not refer to different levels of intellectual functioning but, rather, someone with borderline intellectual functioning may be intellectually disabled within the meaning of the Social Security Act); *Nance v. Warden, Ga. Diagnostic Prison*, 2017 WL 6597934, *7 (N.D. Ga. Aug. 7, 2017) (summarizing the testimony of a mental health expert that those who display borderline intellectual functioning are capable of

achieving secondary education though they may have to repeat certain courses, are generally able to hold down a job, and are able to live independently).  As explained above, the difference is essentially one of deficits in adaptive functioning.  *Fleming v. Berryhill*, 2017 WL 9751318, *21 (D. Utah Sept. 5, 2017).  The key difference between mild intellectual disability and borderline intellectual functioning is the *degree* of adaptive functioning, which refers to how effectively an individual copes with common life demands and how well he or she meets standards of personal independence.  *Wrath-Smith v. Colvin*, 2013 WL 5652467, *6 n.3 (E.D. Wash. Oct. 15, 2013).

Furthermore, in evaluating convicted capital murderers for intellectual disability, it is impractical for federal habeas courts to rely upon federal court decisions arising under the disability provisions of the Social Security Act because a diagnosis of mild mental retardation is not required for a finding of disability.  *See*, *e.g.*, *Martinez v. Colvin*, 2015 WL 4662620, *5 (E.D. Cal. Aug. 20, 2015); *Turnage v. Astrue*, 2012 WL 405590, *6 (D. Kansas Feb. 8, 2012). Judicial evaluations of capital murders for intellectual disability under *Atkins* are *sui generis*.  As a result, little helpful information can be gleaned from review of prior judicial determinations of other *Atkins* claims.  Therefore, such determinations frequently come down to an evaluation of the relative credibility of the contradictory opinions offered by the dueling diagnosticians presented by the State and defense counsel.

Moreover, as Muhammad explains in both his amended petition and motion for stay and abeyance, both of the clinical definitions of intellectual disability cited by the Supreme Court in *Atkins* have undergone dramatic expansion since 2004.  At present the clinical criteria for evaluating and diagnosing an individual as intellectually disabled recognized by both the American Psychiatric Association and the American Association on Intellectual and Developmental Disabilities are radically more expansive than the criteria contained in the

16

definitions cited by the Supreme Court in *Atkins* in 2004.  *See* Doc. 29, at 3–4 (citing the

American Psychiatric Association's ("APA's") clinical criteria for intellectual disability

contained in the *Diagnostic and Statistical Manual of Mental Disorders,* Fifth Edition, Text

Revision (henceforth "DSM-V-TR") (2022), and the American Association on Intellectual and

Developmental Disability's ("AAIDD's") *Intellectual Disability: Definition, Classification, and

Systems of Supports*, Twelfth Edition (2021)).  In support of his *Atkins* claim, Muhammad cites

to a full–scale score of 76 which he allegedly earned during his pretrial detention (admittedly not

the best of circumstances for obtaining a truly accurate reflection of Muhammad's intellectual

capabilities).  Citing the SEM applicable to IQ tests generally and the so-called Flynn effect

(which Muhammad makes little attempt to identify much less explain), he argues that it is

possible to statistically manipulate his full-scale score of 76 into an adjusted score which falls

within the mildly intellectually disabled range.

      Thus, the Supreme Court's decisions addressing a state criminal court's finding of

intellectual disability in a capital murder case have consistently refused to adopt a coherent,

uniform definition of that term, insisting instead that an ethereal distinction exists between the

medical definitions of intellectual disability and borderline intellectual functioning which both

courts and mental health experts have described as questions of degree in measuring adaptive

functioning deficits.  Nonetheless, the Supreme Court has been quick to reverse and criticize

state courts, sometimes in mocking terms, for straying too far from what the Supreme Court

views as the cutting edge in best medical practices.  The result is a chaotic legal landscape in

which state courts and legal jurists and practitioners have wandered aimlessly since *Atkins* in

search of a definition of intellectual disability that will satisfy the Supreme Court and furnish

state and federal courts with some objective criteria beyond an "I know it when I see it"

approach to the subject.  For the reasons discussed above, the Supreme Court's insistence on the use of *clinical* definitions of intellectual disability affords little help to state and federal courts.

What is clear at this juncture is that whether Muhammad is intellectually disabled is a question of fact.  *Matamoros v. Stephens*, 783 F.3d 212, 216 (5th Cir. 2015); *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010).  The Supreme Court and Fifth Circuit have both made clear that, under AEDPA, the proper place for development of the factual bases for federal habeas claims is the state courts.  *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir. 1997) (holding AEDPA clearly places the burden on a federal habeas petitioner to raise and litigate as fully as possible his federal claims in state court).

Finally, the evidence supporting the jury's finding of guilt at Muhammad's capital murder trial was overwhelming.  Muhammad gave police a post–arrest statement in which he confessed that he thought long and hard between the time he first led his sons to the water and then returned with them to drown them.  His double homicide was as premeditated as it was brutal.  The punishment phase evidence of Muhammad's long-standing pattern of violence, especially toward women, was likewise overwhelming, as was the evidence showing his lack of sincere contrition or genuine remorse for his offense.  Even following his arrest, Muhammad insisted on blaming the mother of his children for his decision to brutally murder their two eldest children.

Many of Muhammad's claims in his amended federal habeas corpus petition lack arguable merit; some (such as claims 14 through 20) have repeatedly been rejected by the Fifth

Circuit so many times that, as currently presented to this court, they may violate Rule 11, Fed. R. Civ. P.  *See Johnson v. Lumpkin*, ___ F.4th ___ n.1, 2023 WL 5157563, * 1 n.1 (5th Cir. Aug. 11, 2023) (recognizing the propriety of this court warning a federal habeas petitioner's counsel that presenting constitutional claims attacking the Texas capital sentencing statute's special issues which have repeatedly been rejected by long-standing Circuit precedent without acknowledging the existence of that contrary Circuit authority may violate Rule 11); *Johnson v. Lumpkin*, 74 F.4th 334, 342-43 (5th Cir. 2023) (holding the same); *Williams v. Lumpkin*, 339 F.R.D. 383, 386-91 (N.D. Tex. 2021) (holding that federal habeas claims which attacked the constitutionality of the Texas capital sentencing statute and that had been rejected consistently by the Fifth Circuit over the course of nearly two decades arguably violated Rule 11 because they did not include any acknowledgement of the existence of long-standing Circuit authority to the contrary).

Thus, a finding of intellectual disability may be Muhammad's last best hope for avoiding execution.  Nonetheless, the Court finds that Muhammad's decision to wait until filing his pleadings in this court to assert his *Atkins* claim was not the product of a dilatory motive.  As noted previously, Muhammad's state habeas counsel did include an *Atkins* claim in his initial state habeas application (as his second claim for state habeas relief), but the state habeas court found Muhammad effectively withdrew that claim when his state habeas proceeding reached the stage of an evidentiary hearing by announcing his intention to "suspend" presentation of evidence on Muhammad's second claim for state habeas relief.  2 SHCR 1121, Doc. 59-2 at 597 (citing 3 SHRR 17 [Doc. 59-12 at 17]).  Counsel's professed reason for doing so (according to his federal habeas counsel) was a lack of evidence relevant to the issue of the on-set of Muhammad's intellectual disability.

The state habeas court found that Muhammad's trial counsel had Muhammad evaluated by multiple mental health experts, none of whom diagnosed Muhammad as intellectually disabled, and that Muhammad's state habeas counsel had Muhammad evaluated by at least two more mental health experts, neither of whom diagnosed Muhammad as intellectually disabled.  2 SHCR 1120-21, Doc. 59-2 at 596-97.  The state habeas court noted the primary problem with Muhammad's *Atkins* claim was the fact his own experts determined there was a lack of evidence showing on-set of many of Muhammad's symptoms of intellectual disability prior to age eighteen.  *See* 2 SHCT 1121-22, Doc. 59-2 at 597-98 (noting the lack of evidence showing that Muhammad ever tested below a level of 91 on any standardized test while attending Dallas Independent School District ("DISD") schools and the lack of evidence showing that Muhammad was ever referred for any special education services while attending DISD schools). While still relevant to the issue of intellectual disability under current clinical definitions of that term, the need to present proof of the onset of all of Muhammad's symptoms of intellectual disability prior to the age of eighteen is no longer the barrier to proof of intellectual disability that it was under DSM-IV and similar, now-superseded, publications of the AAIDD.

Muhammad's state habeas counsel cannot reasonably be faulted not anticipating the Supreme Court's opinions in *Moore I* (issued in 2017) or *Moore II* (issued in 2019), at the time Muhammad's initial state habeas application was filed in 2015.  Nor could Muhammad's state habeas counsel be faulted reasonably for failing to anticipate in 2018 (during the evidentiary hearing in Muhammad's state habeas proceeding) the radically more expansive definitions of intellectual disability contained in the APA's latest version of the DSM-V-TR (published in 2022) and the AAIDD's latest version of its definition of intellectual disability (published in 2021).  Clairvoyance is not a required attribute of effective representation. *Brewer v. Lumpkin*,

66 F.4th 558, 564 (5th Cir. 2023); *United States v. Fields*, 565 F.3d 290, 295 (5th Cir. 2009). Even more importantly, Muhammad's state habeas counsel cannot reasonably be faulted for failing to pursue Muhammad's *Atkins* claim after the two mental health experts retained by Muhammad's state habeas counsel were unable to diagnose Muhammad with intellectual disability.

Given the foregoing, the allegedly ineffective assistance of Muhammad's state habeas counsel asserted by Muhammad's federal habeas counsel does not justify a stay and abeyance for the purpose of allowing Muhammad to return to state court and re-litigate his *Atkins* claim on the merits. But the radical changes in the clinical definitions of intellectual disability which have emerged since the Supreme Court's decision in *Moore I* do warrant allowing Muhammad to return to state court to obtain a merits determination of his *Atkins* claim. For the foregoing reasons, Muhammad should be granted a stay and this cause held in abeyance so that he can return to state court and develop the factual and evidentiary basis for his *Atkins* claim.

### B. *Wiggins* Claim

Muhammad also seeks a stay and abeyance for the purpose of returning to state court to relitigate the *Wiggins* claim that was the focal point of his initial state habeas corpus proceeding. This, he is not allowed to do.

Muhammad argues that he is entitled to return to state court and re-litigate the expanded version of his *Wiggins* contained in his federal habeas corpus petition because his state habeas counsel rendered ineffective assistance by failing to adequately investigate Muhammad's background and present all then-available mitigating evidence in support of Muhamad's state habeas court *Wiggins* claim. The Fifth Circuit has recently rejected exactly such a procedural ploy. In *Nelson v. Lumpkin*, 72 F.4th 649 (5th Cir. June 30, 2023), the Fifth Circuit confronted

the identical situation Ricks presents to this Court. In his state habeas application, Nelson presented a single complaint of ineffective assistance by his trial counsel in connection with the punishment phase of his capital murder trial. The state habeas court denied Nelson's ineffective assistance claim on the merits. When Nelson reached federal court, he again presented a single complaint of ineffective assistance at the punishment phase of his state court trial but added a number of new allegations of deficient conduct by his trial counsel. The Fifth Circuit held "[a] state prisoner cannot aggregate alleged instances of ineffective assistance of counsel to satisfy the *Strickland* deficient performance and prejudice requirements and then disaggregate those theories to create new, unadjudicated claims and thereby circumvent § 2254(d)'s limitations." *Nelson*, 72 F.4th at 659-60.

Insofar as Muhammad argues in conclusory fashion that the Supreme Court's holdings in *Martinez v. Ryan*, 556 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), allow him to re-litigate with new evidence his *Wiggins* claim using additional evidence gleaned by his federal habeas counsel, Muhammad misconstrues the holdings in those two Supreme Court opinions. The Supreme Court's holding in *Martinez v. Ryan* furnishes a narrow avenue for circumventing a procedural default. It requires a showing that the performance of a federal habeas petitioner's state habeas counsel was so deficient as to *preclude* state court merits review of a meritorious claim of ineffective assistance by trial counsel, thus permitting a federal habeas court to undertake a merits review of the otherwise procedurally defaulted complaint of ineffective assistance by state trial counsel. *See In re Edwards*, 865 F.3d 197, 207-08 (5th Cir.), *cert. denied*, 137 S. Ct. 909 (2017) (To show cause for procedural default under *Martinez* and *Trevino*, "the petitioner must show (1) that his claim of ineffective assistance of counsel at trial is 'substantial' (i.e., 'has some merit'); and (2) that his habeas counsel was ineffective for failing to

22

present those claims in his first state habeas application." (quoting *Beatty v. Stephens*, 759 F.3d 455, 465-66 (5th Cir. 2014)); *Prystash v. Davis*, 854 F.3d 830, 836 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 649 (2018) (holding the Supreme Court's rulings in *Martinez* and *Trevino* created a narrow exception to the general rules of procedural default that applies only to a claim of ineffective assistance by state trial counsel).  But Muhammad was not precluded from obtaining full merits review of his *Wiggins* claim during his state habeas proceeding.  The TCCA denied that claim on the merits after Muhammad was afforded a full evidentiary hearing on that claim.

The Supreme Court has expressly declined to extend the holdings in *Martinez v. Ryan* and *Trevino v. Thaler* beyond the context of *procedurally defaulted* complaints of ineffective assistance by state trial counsel.  *See Davila v. Davis*, 582 U.S. 521, 528-29 (2017) (declining to extend the holdings in *Martinez*  and *Trevino*  to a complaint of ineffective assistance by state appellate counsel and declaring that doing so would constitute an improper overruling of its prior opinion in *Coleman v. Thompson*); *Busby v. Davis*, 892 F.3d 735, 755-56 (5th Cir. 2018) (citing *Davila* and declining to extend the holdings in *Martinez/Thaler* beyond the context of procedurally defaulted claims of ineffective assistance by state trial counsel).  The holdings in *Martinez* and *Trevino* do not furnish a vehicle for obtaining de novo federal habeas review of constitutional claims which a federal habeas corpus petitioner litigated unsuccessfully in a state habeas corpus proceeding but now wishes to re-litigate using new evidence and different counsel.  *See Broadnax v. Lumpkin*, 987 F.3d 400, 406-07 (5th Cir. 2021) (holding federal habeas review of claim that was litigated on the merits and disposed of on the merits during state habeas proceeding is limited to the evidence presented to the state habeas court).

23

For the foregoing reasons Muhammad's request for a stay and abeyance to allow him to return to state court and re-litigate his *Wiggins* claim with additional evidentiary support should be in all respects denied.[8]

## IV.  CONCLUSION

For the foregoing reasons, Muhammad's *Opposed Motion for Stay and Abeyance*, Doc. 30, should be **GRANTED IN PART**.  The Court should **ORDER** Muhammad to (1) file in the appropriate state court, within 60 days of this Court's grant of his motion for stay and abeyance, both a proposed subsequent state habeas corpus application and a motion seeking appointment by the state court as counsel of record for Muhammad (in accordance with Sections 6(b-1) and 6(b-2) of Article 11.071 of the Texas Code of Criminal Procedure); (2) present the state habeas court with all the factual assertions and evidence he wishes to be considered in the event his *Atkins* claim is reviewed by this Court in the future; and (3) advise this Court of the status of his subsequent state habeas corpus proceeding every 90 days thereafter and immediately advise this Court of any ruling or other action taken by the TCCA on his proposed subsequent state habeas corpus application.

Finally, this cause should be administratively closed pending the TCCA's final disposition of Muhammad's proposed exhaustion of his *Atkins* claim in the state habeas courts.

**SO RECOMMENDED** on August 31, 2023.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

---

[8] As a practical matter, a stay to exhaust Muhammad's *Atkins* claim in the state habeas courts will also permit him to advance related legal and factual arguments as to state habeas counsel's previous failure to pursue his *Atkins* claim.

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation will be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). An objection must identify the finding or recommendation to which objection is made, state the basis for the objection, and indicate where in the magistrate judge's report and recommendation the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).